IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| GENETHA DAVIS, as Administrator of the ESTATE OF WILLIE C. DAVIS, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| *v.* | ) ) | |
| MARK CURRAN, individually and in his official capacity as SHERIFF OF LAKE COUNTY, ILLINOIS, SGT. S. WILSON (#8890), OFC. R. SCULLION (#19194), OFFICER BEAL (#24152), UNKNOWN LAKE COUNTY ADULT CORRECTIONAL FACILITY EMPLOYEES, ARMOR CORRECTIONAL HEALTH SERVICES, INC., DR. ALVARO ENCINAS, CECILIA CARDONA, JEFF VISTAN, MELLODY STANDIFORD, BRYANT CHUA, KAREN OLSON UNKNOWN LAKE COUNTY ADULT CORRECTIONAL FACILITY MEDICAL DIRECTOR, and UNKNOWN ARMOR CORRECTIONAL HEALTH SERVICES INC. EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| *Defendants.* | | |

## **COMPLAINT**

Plaintiff Genetha Davis, as Administrator of the Estate of Willie C. Davis, by and

through her attorneys, Loevy & Loevy, complains of Defendants Sheriff Mark Curran in his

individual and official capacities, Sgt. S. Wilson (#8890), Officer R. Scullion (#19194), Officer

Beal (#24152) Unknown Lake County Adult Correctional Facility Employees (collectively,

Defendant Officers); Armor Correctional Health Services, Inc., Dr. Alvaro Encinas, Cecilia

Cardona, Jeff Vistan, Mellody Standiford, Bryant Chua, Karen Olson, Unknown Lake County

Adult Corrections Facility Medical Director, and Unknown Armor Correctional Health Services,

Inc. Employees (collectively, Defendant Healthcare Providers), and states as follows:

## INTRODUCTION

1.      On September 4, 2017, Willie Davis died from an acute asthma attack he suffered while in the custody of Lake County, Illinois Sheriff's Department.

2.      Mr. Davis's death is particularly tragic and shocking because it was easily preventable: Approximately 26.5 million people suffer from asthma in the United States. With proper care and treatment, this condition is manageable and does not interfere with most daily activities. In fact, individuals who suffer from asthma generally live normal lifespans. According to the Centers of Disease Control and Prevention, in 2016, the national asthma mortality rate was *less than 0.015%.*[1]

3.      Mr. Davis successfully managed his asthma condition for years. On or around August 12, 2017, when Mr. Davis was taken to Lake County, Illinois Adult Corrections Facility ("Lake County Jail" or "LCJ"), he had active prescriptions for medications that controlled the asthma.

4.      During his intake and medical screening process, Mr. Davis alerted Defendants that he suffered from severe asthma and informed them of the medications he was taking.

5.      While in Defendants' custody, Mr. Davis started to exhibit asthma symptoms and repeatedly requested medical assistance and medication.

6.      Although aware of Mr. Davis's condition, Defendants refused to take his condition seriously and failed to provide him with the basic medical care he was entitled to by the United States Constitution.

7.      Eventually his body could not overcome his asthmatic condition, and on the early morning of September 2nd, Mr. Davis was found unconscious in his cell.

---

[1] Source: CDC Most Recent Asthma Data *available at* https://www.cdc.gov/asthma/most_recent_data.htm (last visited on May 23, 2018).

8.      Mr. Davis was taken to hospital. He never regained consciousness and died two days later from complications of his asthma attack.

9.      Plaintiff Genetha Davis, daughter of Willie Davis and administrator of his estate, now seeks justice for the harm that Defendants caused and redress for Mr. Davis's death and the pain he suffered as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Mr. Davis's rights secured by the United States Constitution.

11.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to Plaintiff's claims occurred within this judicial district and, on information and belief, all Defendants reside in this judicial district.

## PARTIES

13.     Willie C. Davis, deceased, was a 61-year-old resident of Waukegan, Illinois at the time of his death.

14.     Plaintiff Genetha Davis is Mr. Davis's daughter and the administrator of his estate.

15.     Defendant Mark C. Curran is a resident of Lake County, Illinois. At all times relevant to the events at issue in this case, he has been the Sheriff of Lake County. In that capacity he is in charge of the Lake County Jail. By law, custom, and/or delegation, he has policymaking authority over the jail for the actions at issue in this case. He is responsible for

ensuring that the policies and practices of the Lake County Jail comply with federal and state requirements for the treatment of detainees. Mr. Curran is named in his individual and official capacities.

16. At all times relevant to the events at issue in this case, Defendants Sgt. S. Wilson (#8890), Officer R. Scullion (#19194), Officer Beal (#24152) and Unknown Lake County Adult Correctional Center Employees were employed by the Lake County Sheriff's Department and worked at the Lake County Jail as correctional staff. As such, these Defendants were acting under color of law and within the scope of their employment. Defendants Wilson, Scullion, and Beal are sued here in their individual capacities.

17. Defendant Armor Correctional Health Services, Inc. ("Armor") is a Florida corporation transacting business in Illinois, and is the healthcare provider for the Lake County Jail. At all times relevant to the events at issue in this case, Armor was responsible for the implementation, oversight, and supervision of healthcare-related policies and practices at Lake County Jail. As an agent of Lake County, Armor was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individually named Defendants and unknown healthcare employees at Lake County Jail.

18. At all times relevant to the events at issue in this case, Defendant Unknown Medical Director was the Medical Director at Lake County Jail, was a final policymaker for Lake County, and was responsible for the implementation, oversight, and supervision of policies and practices at Lake County Jail. Defendant Unknown Medical Director is sued here in his or her individual capacity. At all times relevant to the events at issue in this case, Defendant Unknown Medical Director was acting under color of law and within the scope of his or her employment with Lake County.

4

19.     At all times relevant to the events at issue in this case, Dr. Alvaro Encinas, Cecilia Cardona, Jeff Vistan, Mellody Standiford, Bryant Chua, Karen Olson, and Unknown Armor Correctional Health Services, Inc. employees were employees of Armor Correctional Health Services, Inc. and had the responsibility to provide evaluation, care, treatment, and medication to detainees at the Lake County Jail. At all times relevant to the events at issue in this case, these Defendants were acting under color of law and within the scope of their authority. Defendants Encinas, Cardona, Vistan, Standiford, Chua, and Olson are sued here in their individual capacities.

## FACTUAL ALLEGATIONS

### Willie Davis

20.     Willie Davis was a long-time resident of Lake County, Illinois. He lived with Rhonda Copland, his partner of over 30 years.

21.     He had three living adult children, two sons and a daughter: Michael Tanner (38), Genetha Davis (32), and Willie C. Davis, Jr. (26).

22.     Mr. Davis worked as a mechanic and helped neighbors with odd jobs.

23.     Mr. Davis suffered from asthma, a chronic disease that affects the airways. He was diagnosed with this illness around the late 1980's/early 1990's and had been managing his condition since.

24.     Asthma is an objectively serious medical condition, and at all times relevant to the events at issue in this case, Mr. Davis required medication to control his asthmatic symptoms.

25.     When he was taken into custody at the Lake County Jail on or about August 12, 2017, Mr. Davis was taking prednisone as an oral medication. He also used a prescription inhaler.

**Notice of a Serious Medical Condition**

26.     On August 12, 2017, Mr. Davis arrived at the Lake County Jail. He participated in a booking process the next day, where he was asked questions about his medical conditions and medications. He was taken to the Lake County Jail and went through the booking process the next day.

27.     During the initial classification interview, he told the classification officer that he suffered from asthma and the medical unit was notified. On the same day, he underwent a patient intake health screening. During this screening, he informed the medical staff that he suffered from asthma and provided them with a list of medications he was taking and the pharmacy he used.

28.     The medical staff verified with the pharmacy that Mr. Davis had active prescriptions for Advair, prednisone, and albuterol.

29.     The medical professional noted that Mr. Davis's peak expiratory flow rate (PEFR) was 300. PEFR measures how quickly a person can exhale. The flow rate is lower when the airways are blocked. Normal flow rate for men in Mr. Davis's age group and height is in the 500s.[2]

**Mr. Davis Did Not Receive Proper Medication and Treatment**

30.     On or about August 14, 2017, Defendant Dr. Encinas met with Mr. Davis at the LCJ clinic. At that time Defendant Dr. Encinas reviewed and was aware of Mr. Davis's condition and the medications he was taking. Mr. Davis reported to Dr. Encinas that he suffered from severe asthma, had been taking prednisone for two months, and on information and belief, was

---

[2] Sources: Partners Healthcare Asthma Center, Guide to Asthma Appendix 2: Tables of normal peak flow values, *available at* http://www.asthma.partners.org/NewFiles/Appendix2.html; The Family Practice Notebook – Peak Expiratory Flow Rate, *available at* https://fpnotebook.com/Lung/Lab/PkExprtryFlwRt.htm (last visited on June 19, 2018).

responding well to the medication. Despite this, Dr. Encinas decided to take Mr. Davis off the medication: He continued the medication for a short period and then ordered a tapering of the prednisone.

31.     Defendant Dr. Encinas scheduled Mr. Davis's next clinic visit for two months out and did not issue any orders to monitor Mr. Davis's chronic disorder even though he changed Mr. Davis's treatment plan.

32.     It is common knowledge within the medical community that tapering prednisone may result in serious medical problems and should be monitored closely by a medical professional.

33.     It is also common knowledge within the medical community that stopping prednisone abruptly may cause severe complications, and medical professionals strong advise against sudden interruptions, especially when patients are under extraordinary stress.

34.     On information and belief, Defendants failed to properly taper prednisone from Mr. Davis's system by either not giving him prednisone all together or by reducing the dosage too quickly.

35.     On information and belief, Mr. Davis was not given prednisone or any suitable alternative medication on at least one occasion while he was in custody at the LCJ from August 12, 2017 to September 2, 2017.

**Mr. Davis Suffered from Physical Asthmatic Symptoms at the Jail**

36.     Days prior to his collapse, Mr. Davis exhibited readily apparent physical asthmatic symptoms, such as wheezing and difficulty breathing.

37.     On information and belief, he informed Defendant Officers and Defendant Healthcare Providers of his symptoms and requested medical care and/or his medication.

7

38. Defendants ignored his requests for medical care.

**Mr. Davis's Death**

39. In the early morning of September 2, 2017, Mr. Davis was having difficulty breathing and was crying for help.

40. Other detainees in his dorm observed that Mr. Davis was trying to catch his breath and alerted Defendant Officers that he required medical attention. Specifically, at least one detainee notified Defendant Officer Scullion, who was making his rounds at the time.

41. Defendant Officer Scullion did not respond and walked away.

42. Mr. Davis cried out again for help. This time, Defendant Officer Scullion went to the sleep area and noticed that Mr. Davis was exhibiting what he believed was seizure-like activities.

43. Mr. Davis was not responsive to Defendant Officer Scullion's verbal cues.

44. Approximately ten minutes later Defendant Sgt. Wilson called for an ambulance.

45. By the time medical officials arrived, Mr. Davis was experiencing Pulseless Electrical Activity ("PEA") and taken to Vista Medical Center, where he was pronounced dead on September 4, 2017.

46. As described more fully above, Defendants had notice of Mr. Davis's objectively serious medical condition, knew the risk of harm to Mr. Davis if he was not given appropriate care, knew they were exacerbating that risk by depriving Mr. Davis of his prescribed medications, and still failed to provide him with any proper medical care or access to medical care, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## COUNT I
## 42 U.S.C. § 1983 – Denial of Medical Care
## (Eighth and Fourteenth Amendments)

47.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

48.     As described more fully above, Defendants had notice of Mr. Davis's medical needs and the seriousness of his medical needs and knew the risk of harm to Mr. Davis if he did not receive appropriate medication and medical care. Despite that knowledge, Defendants failed to provide him with any proper medical care or access to his prescribed medication, in violation of the Eighth Amendment of the United States Constitution.

49.     As a result of Defendants' unjustified and unconstitutional conduct, Mr. Davis experienced pain, suffering, emotional distress, injury, and ultimately, death.

50.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Davis's rights.

51.     Alternatively, Defendants were deliberately indifferent to Mr. Davis's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Mr. Davis's rights.

52.     Mr. Davis's injuries were proximately caused by the policies and practices of Defendants Armor and Unknown Medical Director.

53.     At all times relevant to the events at issue in this case, Defendant Curran was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding detainees' access to constitutionally adequate medical care at Lake County Jail; the training of all staff at Lake County Jail on providing detainees access to medical care; and the supervision of the staff at Lake County Jail.

54.     As of August 12, 2017, Defendant Lake County had notice of widespread policies and practices by healthcare and correctional employees at Lake County Jail pursuant to which detainees like Mr. Davis with serious medical needs were routinely denied access to medical care and prescribed medication. It is common at Lake County Jail to observe detainees with clear symptoms of serious medical needs who repeatedly ask for medical care or to see a doctor, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Curran did nothing to ensure that detainees at Lake County Jail receive constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

55.     Specifically, Lake County Jail maintains widespread policies or practices affording detainees unconstitutionally inadequate healthcare, including policies and practices under which: (1) healthcare personnel commonly respond inadequately to detainees who have requested medical attention or medication or asked to see a doctor; (2) healthcare personnel commonly respond inadequately to detainees who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of detainees with a serious medical condition; (4) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (5) healthcare personnel fail to provide timely healthcare to detainees; (6) inadequate levels of healthcare staffing are maintained; (7) emergency medical care is denied or unreasonably delayed to detainees; (8) correctional personnel commonly fail or refuse to respond adequately when detainees request medical

attention or ask to see a doctor; and (9) correctional personnel commonly fail or refuse to respond adequately to detainees who exhibit obvious signs of a serious medical condition.

56.     These widespread policies and practices were allowed to flourish because Defendant Curran, who oversaw healthcare and correctional employees at Lake County Jail and was responsible for ensuring that detainees have access to constitutionally adequate medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Curran violated Mr. Davis's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

57.     The above-described widespread policies and practices, so well-settled as to constitute *de facto* policy at Lake County Jail, were able to exist and thrive because Defendant Curran was deliberately indifferent to the problem, thereby effectively ratifying it.

58.     At all times relevant to the events at issue in this case, Defendant Unknown Medical Director was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Lake County Jail; the training of Lake County and Armor staff at Lake County Jail on providing medical care to detainees and providing detainees access to medical care; and the supervision of Lake County Jail and Armor staff at Lake County Jail who provided medical care and were responsible for providing detainees access to medical care.

59.     As of August 12, 2017, Defendant Unknown Medical Director had notice of widespread policies and practices by healthcare and correctional employees at Lake County Jail pursuant to which detainees like Mr. Davis with serious medical conditions were routinely

denied medical care and access to medical care. It is common at Lake County Jail to observe detainees with clear symptoms of serious medical needs who repeatedly ask for medical care or to see a doctor, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Unknown Medical Director did nothing to ensure that detainees at Lake County Jail received constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

60.     Specifically, Lake County Jail maintains widespread policies or practices at Lake County Jail affording detainees unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly respond inadequately to detainees who have requested medical attention or medication or asked to see a doctor; (2) healthcare personnel commonly respond inadequately to detainees who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of detainees with a serious medical condition; (4) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (5) healthcare personnel fail to provide timely healthcare to detainees; (6) inadequate levels of healthcare staffing are maintained; (7) emergency medical care is denied or unreasonably delayed to detainees; (8) correctional personnel commonly fail or refuse to respond adequately when detainees request medical attention or ask to see a doctor; and (9) correctional personnel commonly fail or refuse to respond adequately to detainees who exhibit obvious signs of a serious medical condition.

61.     These widespread policies and practices were allowed to flourish because Defendant Unknown Medical Director, who oversaw the provision of healthcare to detainees at Lake County Jail and was responsible for ensuring that detainees have access to medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Unknown Medical Director violated Mr. Davis's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

62.     The above-described widespread policies and practices, so well-settled as to constitute *de facto* policy at Lake County Jail, were able to exist and thrive because Defendant Unknown Medical Director was deliberately indifferent to the problem, thereby effectively ratifying it.

63.     At all times relevant to the events at issue in this case, Defendant Armor contracted with Lake County to provide healthcare to men housed at Lake County Jail, including Mr. Davis. As the provider of healthcare services to detainees held at Lake County Jail, Armor is responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to detainees in Lake County custody.

64.     As of August 12, 2017, Defendant Armor had notice of widespread policies and practices by healthcare personnel at Lake County Jail pursuant to which detainees like Mr. Davis with serious medical conditions were routinely denied medical care. It is common at Lake County Jail to observe detainees with clear symptoms of serious medical needs, who repeatedly ask for medical care or to see a doctor, and whose requests are routinely delayed or completely ignored by healthcare personnel. Despite knowledge of these problematic policies and practices,

13

Defendant Armor did nothing to ensure that detainees at Lake County Jail receive adequate medical care, thereby acting with deliberate indifference.

65.    Specifically, there exist widespread policies or practices at Lake County Jail pursuant to which detainees receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly respond inadequately to detainees who have requested medical attention or medication or asked to see a doctor; (2) healthcare personnel commonly respond inadequately to detainees who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of detainees with a serious medical condition; (4) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (5) healthcare personnel fail to provide timely healthcare to detainees; (6) inadequate levels of healthcare staffing are maintained; and (7) emergency medical care is denied or unreasonably delayed to detainees.

66.    These widespread policies and practices were allowed to flourish because Defendant Armor, which directs the provision of healthcare services at Lake County Jail, directly encourages the very type of misconduct at issue in this case, fails to provide adequate training and supervision of healthcare and correctional employees, and fails to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Armor violated Mr. Davis's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

14

67.     The above-described widespread policies and practices, so well-settled as to constitute *de facto* policy at Lake County Jail, were able to exist and thrive because Defendant Armor was deliberately indifferent to the problem, thereby effectively ratifying it.

68.     Mr. Davis's injuries were caused by employees of Lake County and Armor, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices by engaging in the misconduct described in this Count.

## COUNT II
## 42 U.S.C. § 1983 – Conspiracy

69.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

70.     Defendants reached an agreement among themselves to deprive Mr. Davis of his constitutional rights and to protect one another from liability for depriving Mr. Davis of his rights, all as described in the various paragraphs of this Complaint.

71.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

72.     The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Davis's rights.

73.     As a direct and proximate result of the illicit prior agreement referenced above, Mr. Davis's rights were violated and he suffered injuries, including pain, suffering, emotional distress, and ultimately death.

74.     Mr. Davis's injuries were caused by employees of Lake County and Armor, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

15

## COUNT III
## 42 U.S.C. § 1983 – Failure to Intervene
## (Eighth and Fourteenth Amendments)

75.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

76.     As described more fully above, Defendants had a reasonable opportunity to prevent the violation of Mr. Davis's constitutional rights, as set forth above, had they been so inclined, but they failed to do so.

77.     Defendants' failures to act were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Davis's rights.

78.     As a direct and proximate result of Defendants' misconduct, Mr. Davis's rights were violated and he suffered injuries, including pain, suffering, emotional distress, and ultimately death.

79.     Mr. Davis's injuries were caused by employees of Lake County and Armor, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT IV
## Survival Action – Intentional Infliction of Emotional Distress

80.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

81.     In the manner described more fully above, by denying Mr. Davis medical evaluation or treatment, or access to medical evaluation or treatment, Defendants engaged in extreme and outrageous conduct.

82.     Defendants' actions as set forth above were rooted in an abuse of power or authority.

16

83. Defendants' actions as set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

84. Defendants' actions, as set forth above, were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Davis's rights.

85. The misconduct described in this Count was undertaken by Defendants within the scope of their employment such that their employers, Lake County and Armor, are liable for their actions.

86. As a direct and proximate result of this misconduct, Mr. Davis suffered injuries—including severe emotional distress and great conscious pain—and suffering prior to his death.

87. Mr. Davis filed no action during his lifetime, but under the laws of the State of Illinois, this action survives and may be asserted by his Estate.

88. Plaintiff Genetha Davis, on behalf of the Estate of Mr. Davis, claims damages for the conscious pain and suffering of Mr. Davis, pursuant to 755 ILCS § 5/27-6, commonly referred to as the Illinois Survival Act.

## COUNT V
### Survival Action – Negligent or Willful and Wanton Conduct

89. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

90. In the manner described more fully above, the actions of Defendants breached the duty of care owed to detainees in their care. They did so by negligently ignoring Mr. Davis's request for medical attention.

91. Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an

injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

92.     Defendants' actions were undertaken willfully and wantonly and/or with reckless indifference or conscious disregard for Mr. Davis's safety.

93.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Davis suffered injuries, including pain, suffering, emotional distress, and ultimately death.

94.     Mr. Davis filed no action during his lifetime, but under the laws of the State of Illinois, this action survives and may be asserted by his Estate.

95.     Plaintiff Genetha Davis, on behalf of the Estate of Mr. Davis, claims damages for the conscious pain and suffering of Mr. Davis, pursuant to 755 ILCS § 5/27-6, commonly referred to as the Illinois Survival Act.

**COUNT VI**
**Wrongful Death – Negligent or Willful and Wanton Conduct**

96.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

97.     In the manner described more fully above, Defendants' actions breached the duty of care owed to detainees in their care. They did so by negligently ignoring Mr. Davis's requests for medical attention.

98.     Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

99.     Defendants' actions were undertaken willfully and wantonly and/or with reckless indifference or conscious disregard for Mr. Davis's safety.

100. As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Davis suffered injuries, including pain, suffering, emotional distress, and ultimately death.

101. Plaintiff Genetha Davis, as Mr. Davis's daughter and the administrator of his estate, claims damages for the wrongful death of Mr. Davis, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel, and advice, and for Plaintiff's mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS § 180/1, the Illinois Wrongful Death Act.

## COUNT VII
## Respondeat Superior – Armor Correctional Health Services, Inc.

102. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

103. In committing the acts alleged in the preceding paragraphs, Defendant Healthcare Providers were employees, members, and agents of Armor acting at all relevant times within the scope of their employment.

104. Under state law, Defendant Armor Correctional Health Services, Inc. is vicariously liable as principal for all torts committed by its agents.

105. Defendant Armor Correctional Health Services, Inc., as a private corporation acting under color of state law, should additionally be held vicariously liable under 42 U.S.C. § 1983 for the unconstitutional conduct of the Defendant Healthcare Providers. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

## COUNT VIII
### Indemnification

106.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

107.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

108.    Defendants are or were employees of Lake County and/or Lake County Sheriff's Department and acted within the scope of their employment in committing the misconduct described above.

109.    Lake County is obligated to pay any judgment entered against individual Defendants within the scope of their employment for Lake County.


WHEREFORE, Plaintiff Genetha Davis, as Administrator of the Estate of Willie C. Davis, respectfully requests that this Court enter a judgment in her favor and against Defendants Sheriff Mark Curran in his individual and official capacities, Sgt. S. Wilson (#8890), Officer R. Scullion (#19194), Officer Beal (#24152), Unknown Lake County Adult Correctional Facility Employees (collectively, Defendant Officers); Armor Correctional Health Services, Inc., Dr. Alvaro Encinas, Cecilia Cardona, Jeff Vistan, Mellody Standiford, Bryant Chua, Karen Olson, Unknown Lake County Adult Corrections Facility Medical Director, and Unknown Armor Correctional Health Services, Inc. Employees, awarding compensatory damages, including medical and funeral expenses, punitive damages, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Genetha Davis hereby demands a trial by jury pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure on all issues so triable.


Respectfully submitted,

/s/ Joshua Loevy
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Michael Kanovitz
Joshua Loevy
Cindy Tsai
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
312-243-5900